CHRISTINE M. TOBIN-PRESSER (WSBA #27628)     HONORABLE FREDERICK P. CORBIT
THOMAS A. BUFORD (WSBA # 52969)
JASON WAX (WSBA #41944)
SHANE E. CREASON (WSBA #63865)
BUSH KORNFELD LLP
601 Union Street, Suite 4630
Seattle, WA 98101
Tel.:  (206) 292-2110
Facsimile:  (206) 292-2104
Emails:   ctobin@bskd.com; tbuford@bskd.com;
jwax@bskd.com; and screason@bskd.com

JOHN E. MITCHELL (TEX. Bar #797095)**
YELENA ARCHIYAN (TEX. Bar #24119035)**
KATTEN MUCHIN ROSENMAN LLP
2121 N. Pearl St. Suite 1100
Dallas, TX 75201
Tel.:  (214) 765-3600
Emails: john.mitchell@katten.com and
yelena.archiyan@katten.com

* *Pro Hac Vice* Pending

*Proposed Attorneys for the Chapter 11
Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) Joint Administration Requested |
| Brewster Heights Packing & Orchards, LP, *et al.*,[1] | ) |
| | ) Case No. 26-01136 (FPC) |
| Debtors. | ) |
| | ) DECLARATION OF BROOKE MCGUIRE IN SUPPORT OF THE DEBTORS' BANKRUPTCY PETITIONS AND FIRST DAY PLEADINGS |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

[1] The debtors are Brewster Heights Packing & Orchards, LP (Case No. 26-01136); Gebbers Farms Inc. (Case No. 26-01140); Gebbers Orchards, Inc. (Case No. 26-01141); C&M II, LLC (Case No. 26-01137); D&E Storage, LLC (Case No. 26-01138); Eastco, LLC (Case No. 26-01139); GF SA, LLC (Case No. 26-01142); Northco, LLC (Case No. 26-01143); P&G Orchards, LLC (Case No. 26-01144); REPO, LLC (Case No. 26-01145); TJF Properties, LLC (Case No. 26-01146); Westco Orchards, LLC (Case No. 26-01147); and Westco Sales, Inc. (Case No. 26-01148).

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 55

I, Brooke McGuire, hereby declare under penalty of perjury:

1.     I submit this declaration (this "Declaration") in my capacity as the Chief Financial Officer of Brewster Heights Packing & Orchards, LP ("BHPO," together with its Debtor affiliates, the "Debtors," and collectively with their non-Debtor affiliates, the "Company"). I am intimately familiar with the Debtors' businesses, financial affairs, and books and records. I am above 18 years of age, and I am competent to testify.

2.     I am authorized to submit this Declaration on behalf of the Debtors. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information I have received from the Debtors' advisors. If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of each Debtor.

3.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition (together, the "Chapter 11 Petitions") under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") commencing these chapter 11 cases (these "Chapter 11 Cases"). I submit this Declaration in support of the Chapter 11 Petitions and certain other "first day" motions designed to maximize the value of the Debtors' businesses through the commencement of these Chapter 11 Cases (each, a "First Day Pleading" and collectively, the "First Day Pleadings").[2] I believe that the First Day Pleadings are (i) necessary to enable the Debtors to operate

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the relevant First Day Pleading.

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 2

in chapter 11 while maximizing productivity and the Debtors' value, (ii) a critical element in achieving a successful landing in and journey through chapter 11, (iii) essential to maximizing the value of the Debtors' estates and maintaining their operations while they conduct a value-maximizing marketing process for their assets and pursue confirmation of a plan, and (iv) in the best interests of the Debtors, their estates and their creditors. Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly tailored and necessary to achieve the goals identified above.

4. This Declaration is divided into three parts. *Part I* provides an overview of the Debtors, their businesses, their capital structure, and their prepetition indebtedness. *Part II* describes the circumstance surrounding the commencement of these Chapter 11 Cases and what the Debtors view as the path forward. *Part III* discusses the First Day Pleadings.

**A. Overview of the Debtors' Businesses and Financial Affairs**

(1) Company Background

5. The Company is a market-leading, vertically integrated grower, packer, marketer, and shipper of apples, cherries, and pears headquartered in Brewster, Washington. With a legacy spanning over a century, the Company has established itself as one of the largest and most respected producers in the U.S. tree fruit industry, supplying high quality fruit to customers across the globe.

6. The Company is, at its core, a family-owned and operated business, now in its sixth generation of family leadership. The Gebbers family's roots in Brewster, Washington date back over 100 years. Over the decades, the family has expanded the

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 3

business from its original timber and sawmill operations into one of the largest apple and cherry producers in the country.

7. The Company operates through BHPO, doing business as Gebbers Farms, and is supported by a network of affiliated entities involved in growing, packing, and distribution. The Company's operations are fully integrated, encompassing the cultivation of fruit on approximately 8,500 acres of prime orchard land, state-of-the-art packing and storage facilities, and a robust sales and marketing platform. Gebbers Farms is a key partner in Alta Fresh DBA Chelan Fresh Marketing ("Chelan Fresh"), a subsidiary of BHPO formed in 2004 to be the Company's sales and marketing arm. Today, Chelan Fresh distributes the Company's fruit to both domestic and international markets. Chelan Fresh is not a debtor in these Chapter 11 Cases. The Company's vertically integrated model allows it to capture value at every stage of the supply chain, from growing and harvesting to packing, marketing, and shipping. The Company's partnership with Chelan Fresh provides access to a global customer base, including long-standing relationships with major U.S. grocery retailers and international buyers. Chelan Fresh's centralized marketing desk and brand-driven strategy have enabled the Company to command premium pricing for its proprietary varieties of fruit.

8. Debtor Gebbers Orchards, Inc. ("Gebbers Orchards") was the Company's original family farm and operating company. Debtors D&E Storage LLC ("D&E") and Brewster Heights Packing, Inc. ("BHP") were Gebbers Orchards' warehouse operations, which the Gebbers family co-owned with another family. That operation resulted in bankruptcy in 2002, following which the remaining assets of D&E, BHP

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 4

and Gebbers Farms, Inc. were integrated to form a new operating company, BHPO. A more fulsome description of the Company's corporate structure is set forth below.

9. Today, the Company manages approximately 6,816 acres of apple orchards and 1,581 acres of cherry orchards, with an additional 1,659 acres of pre-productive plantings. The Company's facilities include ten owned packing and storage houses, with a combined cold storage capacity of over 709,000 square feet and the ability to pack approximately 287,000 apple bins and 2.4 million cherry boxes annually. These modern facilities are strategically located in the Okanogan fruit belt, an area renowned for its optimal growing conditions, which support consistent, high-quality production.

10. The Company produces over 25 varieties of apples and cherries, including high-value proprietary varieties such as SugarBee™, Rockit™, and Lucy™ (Lucy Glo™ and Lucy Rose™), for which BHPO holds exclusive or leading grower rights. This diverse varietal mix enables the Company to meet evolving consumer preferences and maintain profitability despite commodity market volatility. In fiscal year 2024, the Company sold approximately 17.3 million boxes of fruit, including 13.3 million boxes of apples and 3.4 million boxes of cherries, to more than 540 clients worldwide. The Company is committed to innovation and sustainability, investing in advanced orchard management practices, cutting-edge packing technology, and regenerative agricultural methods. The Company has a proven track record of developing and commercializing new fruit varieties, expanding its international sales footprint, and pursuing value-added product opportunities. Ongoing capital investments in automation and facility expansion are designed to increase capacity, improve efficiency, and support future growth.

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 5

11. The Company's leadership team includes members of the founding family, now in its sixth generation, who remain actively involved in day-to-day operations and strategic planning. The Company's workforce includes both year-round and seasonal employees. A significant portion of the Debtors' Employees are employed through the "H-2A Program," a visa program administered by the U.S. Department of Labor which permits U.S. employers to hire non-U.S. citizens to fulfill temporary agricultural jobs. As of the Petition Date, the Debtors employ a total of approximately 3,742 employees.[3]

12. The Debtors' operations are conducted on or around properties that are adjacent to or nearby other farms owned or operated by related-party family entities or certain unrelated growers (collectively, the "Affiliated Farms") in and around Brewster, Washington. Given the proximity of these operations and the shared nature of certain resources and infrastructure, the Debtors and the Affiliated Farms have long shared certain operating costs. To streamline this arrangement, in May 2025, BHPO, the Gebbers family, and the Affiliated Farms formed Gebbers Farm Services, LLC ("GFS") as a centralized cost-sharing vehicle, pursuant to which GFS pays the shared operating costs up front on behalf of the Debtors and the Affiliated Farms, aggregates those expenditures, and at month-end issues a single invoice to BHPO and each Affiliated Farm for its allocable share.[4]

---

[3] Additional information about the Debtors' workforce is set forth in the *Debtors' Motion for Entry of an Order (I) Authorizing Debtors to (A) Pay Employee Obligations, and (B) Continue Their Compensation and Benefits Program in Effect as of the Petition Date; and (II) Granting Related Relief; Memorandum of Points and Authorities*.

[4] A fulsome description of GFS is set forth in *Debtors' Motion for Entry of an Order Authorizing the Debtors to Continue Transacting Business with Gebbers Farm Services, LLC in the Ordinary Course of Business*.

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 6

13. With its extensive land holdings, modern infrastructure, diverse product offerings, and strong market relationships, the Company is a cornerstone of the U.S. tree fruit industry. The Company's scale, vertical integration, and focus on innovation position it to continue delivering high-quality fruit to customers worldwide, while maintaining a commitment to sustainability, employee well-being, and the preservation of its family-owned legacy.

(2)     The Debtors' Corporate Structure

14. Debtor BHPO is a Nevada limited partnership and the central operating entity for the Debtors. The sole general partner of BHPO is Gebbers Orchards, Inc., a Washington corporation.

15. All of the other Debtors are Washington limited liability companies, with the exception of Westco Sales, Inc., which is a Nevada corporation, and REPO, LLC, a Nevada limited liability company. All are wholly owned by BHPO.

16. A corporate organizational chart is attached hereto as **Exhibit 1**.

17. As described above, Debtor Gebbers Orchards was the Company's original family farm and operating company, and Debtors D&E and BHP were Gebbers Orchards' warehouse operations. Today, BHPO and D&E own the Company's warehouses but neither maintains its own separate books and records.

18. With the exception of Gebbers Farms, Inc., the Debtors' orchard operations are conducted through a series of wholly owned subsidiaries of BHPO, each of which holds the land on which one or more orchards operate. These orchard land-holding entities include P&G Orchards, LLC; Eastco, LLC; Northco, LLC; Westco Orchards, LLC; and REPO, LLC. TJF Properties, LLC is a wholly owned

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 7

subsidiary of Eastco that was formed to acquire one specific orchard property.[5] C&M II, LLC is also a wholly owned subsidiary of BHPO that holds land but, unlike the other orchard entities, does not have any active orchards operating on its property.

19.   Debtor GF SA, LLC ("GFSA") is a U.S. holding entity that serves as one of the layers in BHPO's ownership structure for its investment in CHISA, a warehouse and orchard operation in Chile. BHPO previously owned approximately 25% of CHISA through multiple layers of entities below GFSA, which are foreign entities and are not debtors in these Chapter 11 Cases. The Company has written down its investment in the Chilean operations significantly due to viability issues with those operations. Lastly, Debtor Westco Sales, Inc., another subsidiary of BHPO, is an inactive entity which does not maintain its own books and records.

(3)   The Debtors' Prepetition Obligations

20.   Prior to the filing of these Chapter 11 Cases, the Debtors were party to three primary secured credit facilities (together with all related documents, the "Prepetition Credit Facilities"), as set forth below. Unless otherwise noted, capitalized terms in this subsection have the meanings ascribed to them in the applicable loan documents.

### i.   *The BMO Credit Facilities*

21.   The Debtors are party to two secured credit facilities with BMO Bank N.A., as successor-in-interest to Bank of the West ("BMO"), including (i) a syndicated revolving credit facility (the "Syndicated Facility"), with BMO acting as

---

[5] Gebbers Farms Cherries, GP, P&G Cherries, GP, Eastco Cherries, GP, Northco Cherries, GP, Westco Cherries, GP, and REPO Cherries, GP (the "GP Entities") are the operating entities that lease cherry orchards from each of Gebbers Farms, Inc. P&G Orchards, LLC, Eastco, LLC, Northco, LLC, Westco Orchards, LLC, and REPO, LLC, respectively, to segregate them for crop insurance purposes. The GP Entities are not debtors in these Chapter 11 Cases.

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 8

administrative agent (in such capacity, the "Syndicated Agent") for itself and other lenders (the "Syndicated Lenders"); and (ii) a separate bilateral revolving credit facility (the "Bilateral Facility," and together with the Syndicated Facility, the "BMO Facilities"), with BMO as sole lender (the "Bilateral Lender").

22. The Syndicated Facility is evidenced by that certain Loan and Security Agreement dated as of June 10, 2021 (as the same may have been amended, extended, consolidated, assigned, or otherwise modified, the "BMO Syndicated Loan Agreement") by and among the Debtors, the Syndicated Lenders, and Syndicated Agent, and such other agreements, instruments, certificates and documents executed by the Debtors in connection with the BMO Syndicated Loan Agreement (such other agreements, instruments, certificates and documents, together with the BMO Syndicated Loan Agreement, collectively, the "BMO Syndicated Loan Documents"). Pursuant to the BMO Syndicated Loan Agreement, the Syndicated Lenders provided Debtors with senior secured revolving line of credit loans, in the maximum principal amount of up to $88,000,000, and senior secured term loans, in the original aggregate principal amount of $14,840,000. As of the Petition Date, the Debtors owed the Syndicated Lenders approximately $56,270,440.61, plus additional accrued and unpaid interest, fees, costs, expenses, protective advances, indemnification obligations, and other amounts due (the "Syndicated Obligations").

23. The Syndicated Obligations are secured by liens and security interests in substantially all of the Debtors' personal property assets, as well as other collateral pledged by certain of the Debtors, certain of the guarantors of the Syndicated Obligations, and certain third party pledgors, including, without limitation, liens on the land and the fixtures, structures and improvements and personal property

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 9

constituting fixtures located on the real properties described in the BMO Syndicated Loan Documents as the "King Blossom, CA Property," the "Hunt Ranch & Asmussen Property," the "Gamble Lumber Company Town Mill Site," the "Snyder Flats Property," and the "MC-Guelich Property" (the "Syndicated Collateral"). The BMO Syndicated Loan Documents are cross-defaulted with the BMO Bilateral Loan Documents and cross-collateralized with the Bilateral Collateral.

24. The Bilateral Facility is evidenced by that certain Loan and Security Agreement, dated as of August 29, 2022 (as the same may have been amended, extended, consolidated, assigned, or otherwise modified, the "BMO Bilateral Loan Agreement"), by and among the Debtors and the Bilateral Lender, and such other agreements, instruments, certificates and documents executed by the Debtors in connection with the BMO Bilateral Loan Agreement (such other agreements, instruments, certificates and documents, together with the BMO Bilateral Loan Agreement, collectively, the "BMO Bilateral Loan Documents"). Pursuant to the BMO Bilateral Loan Agreement, BMO provided Debtors with a senior secured term loan in the original principal amount of $8,500,000. As of the Petition Date, the outstanding principal balance of the aforementioned term loan is approximately $6,569,000.08, plus additional accrued and unpaid interest, fees, costs, expenses, protective advances, indemnification obligations, and other amounts due under the Bilateral Facility (the "Bilateral Obligations").

25. The Bilateral Obligations are secured by a lien on the land and the fixtures, structures and improvements and personal property constituting fixtures located on the real property described in the BMO Syndicated Loan Documents as the "King Blossom, CA Property" and commonly known as 125 North Star Road,

Brewster, WA 98812 (the "Bilateral Collateral"). The BMO Bilateral Loan Documents are cross-defaulted with the BMO Syndicated Loan Documents and cross-collateralized with part of the Syndicated Collateral.

26. Certain Events of Default occurred under both the Syndicated Facility and Bilateral Facility, as further detailed in the BMO Syndicated Forbearance Agreement and BMO Bilateral Forbearance Agreement (defined, *infra*). On September 10, 2025, the Debtors executed (i) that certain Amended and Restated Forbearance Agreement and Amendment Number Twelve to Loan and Security Agreement, by and among the Debtors, the guarantors of the Syndicated Obligations, the Syndicated Lenders and the Syndicated Agent, with respect to the Syndicated Loan Documents (as the same may have been amended, extended, consolidated, assigned, or otherwise modified, the "BMO Syndicated Forbearance Agreement"), and (ii) that certain Second Amended and Restated Forbearance Agreement, by and among the Debtors, the guarantors of the Bilateral Obligations, and the Bilateral Lender, with respect to the Bilateral Loan Documents (as the same may have been amended, extended, consolidated, assigned, or otherwise modified, the "BMO Bilateral Forbearance Agreement").

27. Pursuant to the BMO Syndicated Forbearance Agreement, the Syndicated Lenders agreed, among other things, (i) to forbear from exercising default-related remedies through November 14, 2025, unless earlier terminated by specific events and (ii) to amend the BMO Syndicated Loan Agreement. The forbearance was conditioned upon, *inter alia*, the Debtors' continued retention of Peter Richter, as chief restructuring officer, and Capstone Capital Markets LLC, as investment banker ("Capstone"), to market the sale of substantially all of the Debtors' assets. The BMO

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 11

Syndicated Forbearance Agreement also established certain sale milestones and consummation of a sale by November 1, 2025.

28. Under the BMO Bilateral Forbearance Agreement, the Bilateral Lender agreed to forbear from exercising remedies with respect to the Bilateral Collateral through November 14, 2025, unless earlier terminated by specified events. The BMO Bilateral Forbearance Agreement was subject to conditions and milestones that were substantially similar to those included in the BMO Syndicated Forbearance Agreement.

29. No further forbearance agreements have been entered into with respect to the BMO Facilities since the BMO Syndicated Forbearance Agreement and the BMO Bilateral Forbearance Agreement, each of which expired on November 14, 2025, without the consummation of a sale.

### ii. The Prudential Term Loan Facility

30. The Debtors are also party to a long-term mortgage financing facility with The Prudential Insurance Company of America ("Prudential"), evidenced by (i) that certain Loan Agreement, dated as of May 28, 2020 (as the same may have been amended, extended, consolidated, assigned, or otherwise modified, including but not limited to by that certain Loan Modification Agreement, dated as of August 12, 2020, that certain Second Loan Modification Agreement, dated as of April 28, 2022, and that certain Third Loan Modification Agreement, dated as of June 9, 2023, the "Prudential Loan Agreement,") and (ii) three separate promissory notes originally aggregating $187,000,000.00 (collectively, the "Prudential Notes").

31. The Prudential Loan Agreement and the Prudential Notes are secured by, among other things, that certain Mortgage, Security Agreement, Crop Filing and

Fixture Filing with Assignment of Rents and Proceeds, Leases and Agreements, dated as of May 28, 2020 (the "Instrument"), granting to Prudential, among other things, a lien on and/or security interest in the real property described in said Instrument and certain personal property (collectively, the "Prudential Collateral"), certain assignment(s) of leases and rents, and certain other security instruments.

32. As of February 23, 2026, the aggregate principal balance outstanding under the Prudential Notes was approximately $162,340,000.00. Following covenant breaches under the Prudential Loan Agreement, Prudential and the Debtors entered into that certain Fourth Amended and Restated Loan Modification and Forbearance Agreement, dated as of March 27, 2026 (as the same may have been amended, extended, consolidated, assigned, or otherwise modified, the "Prudential Forbearance Agreement"). The Prudential Forbearance Agreement amended the Prudential facility and all prior forbearance agreements, deferred all scheduled debt service during the forbearance period, and provided that Prudential would forbear from exercising remedies until the earliest of May 1, 2026, and the occurrence of a Forbearance Termination Event (as defined in the Prudential Forbearance Agreement).

33. No further forbearance agreements have been entered into between the Debtors and Prudential since the expiration of the Prudential Forbearance Agreement. However, Prudential has delivered reservation of rights letters to the Debtors on multiple occasions.

### iii.    *Backstop Ag Capital Joint Venture Crop Loan*

34. On March 25, 2026, BHPO, Backstop Ag Capital, a Washington joint venture comprising a group of non-debtor individuals with family or personal relationships with BHPO's equity holders ("Backstop"), and Prudential entered into

that certain Term Sheet (the "Backstop Ag Term Sheet"), under which Backstop agreed to provide BHPO an $8,000,000 crop loan (the "Crop Loan") to fund (i) the production of the 2026 orchard crop, (ii) administrative and BHPO advisor costs, and (iii) preparation for a chapter 11 filing, each pursuant to a budget agreed to among Backstop, BHPO, and Prudential.

35. The Crop Loan is secured by a first priority crop lien in the 2026 orchard crop pursuant to, *inter alia*, RCW 60.11.050(4), and consented to pursuant to an agreed subordination agreement with each of Prudential and BMO. Backstop's security interest is *pari passu* with other loans provided for the 2026 crop.

36. The Crop Loan is conditioned upon Prudential agreeing to forbear from exercising remedies under the Prudential Loan Agreement, consistent with the Prudential Forbearance Agreement, through May 1, 2026, and also subject to BHPO achieving certain milestones. The Crop Loan also required the reconstitution of the BHPO Board of Directors to consist of two existing directors and one independent director acceptable to Prudential.

### iv. The Westerdahl Orchard Loan

37. On or about June 27, 2013, BHPO and North Cascades National Bank ("NCNB") entered into that certain Business Loan Agreement (as the same may have been amended, extended, or otherwise modified, the "NCNB Loan Agreement"), evidencing a commercial loan in the original principal amount of $1,400,000.00 (the "NCNB Note"). The NCNB Loan Agreement has a maturity date of June 27, 2033.

38. The obligations under the NCNB Loan Agreement are secured by security interests in collateral granted pursuant to that certain Mortgage dated June 27, 2013.

39. As of the Petition Date, the aggregate principal balance outstanding under the NCNB Note was approximately $700,912.16.

### v. Happy Valley Loan

40. On or about May 19, 2022, Debtor Westco Orchards, LLC and Happy Valley USA Credit III, LLC ("Happy Valley") entered into that certain Real Estate Term Loan 1 Note (as the same may have been amended, extended, or otherwise modified, the "Happy Valley Note"), in the original principal amount of $4,200,000.00 (the "Happy Valley Term Loan"). The Happy Valley Term Loan is an interest-only loan, with interest payable quarterly in arrears, and the entire outstanding principal balance due and payable as a lump sum upon maturity (May 19, 2027). The proceeds of the Happy Valley Term Loan were used to purchase real estate.

41. The obligations under the Happy Valley Note are secured by a first priority mortgage, assignment of rents, and security agreement on certain real property located in Okanogan County, Washington, together with all improvements, easements, water rights, permanent crop plantings, and related personal property thereon. The Happy Valley Term Loan is guaranteed by BHPO.

42. As of the Petition Date, the aggregate principal balance outstanding under the Happy Valley Note was approximately $4,200,000.00.

### vi. Unsecured Debt

#### a) Note to Apple House

43. Over a number of years, BHPO accrued accounts payable in favor of Apple House. On or about December 1, 2019, BHPO and Apple House converted the outstanding accounts payable balance of approximately $6,000,000.00 into a long-term note pursuant to that certain Debt Restructure Agreement (the "Apple House

Note"), with repayment to occur in monthly installments and amortized over fifteen (15) years commencing on September 1, 2020, in accordance with certain terms and conditions as set forth in the Debt Restructure Agreement. The Apple House Note is not secured by any collateral and is subordinate to all other debts.

### b) General Unsecured Claims

44. The Debtors' books and records reflect approximately $24,000,000.00 in unsecured debt incurred in the ordinary course of business, principally comprised of trade payables.

### B. Events Leading to the Commencement of the Debtors' Chapter 11 Cases and Path Forward

(1) Events Precipitating the Filing of These Chapter 11 Cases

45. Since approximately the fourth quarter of 2024, the Debtors have been operating under an increasingly acute liquidity squeeze driven by the over-levering of their debt, competing positions taken by their senior secured lenders, and the working-capital demands attendant to the 2025 crop cycle.

46. The Debtors' financial distress has been compounded by severe headwinds facing the Washington agricultural sector as a whole. In 2024, Washington's agricultural operators experienced an estimated cumulative take-home pay of -$300 million, the lowest "returns to operators" metric of any state in the nation. Total production expenses for Washington producers have nearly doubled since 2016, with the state ranking eighth in the nation for total agricultural production expenses, yet 42nd for net farm income. Washington's recent economic uncertainty has been driven by, among other things, rising input costs, trade challenges, labor and workforce concerns, fluctuations in tariffs, land cost and development pressure, changing climatic conditions, and infrastructure challenges. These macro-level cost

pressures are particularly acute for tree-fruit producers like the Debtors. In 2023, labor alone accounted for 99% of the average apple producer's return per bin, leaving virtually no margin to absorb additional financial shocks. Moreover, Washington's competitive advantage in the very commodities the Debtors cultivate has eroded, with the concentration of apple and cherry production in the state declining by 7% and 52%, respectively, between 2017 and 2023.[6]

47.    As noted above, the Debtors owe Prudential and BMO in the aggregate no less than approximately $225,179,440.69. Although the Debtors remained current on all scheduled debt service (until January 2025), they triggered defaults under certain financial covenants under the Prudential Loan Agreement in late 2024 (and, in May 2025, under the Syndicated Facility and Bilateral Facility, as well). The resulting defaults prompted both Prudential and BMO beginning in late 2024 to early 2025 to declare reservations of rights and to condition any further credit availability upon rapidly consummating either a sale of the Company or a refinancing that would take both lenders out in full.

48.    Against this backdrop, the Debtors engaged a chief restructuring officer, financial advisor, and Katten Muchin Rosenman LLP as legal advisor to advise the Debtors in connection with a restructuring designed to maximize value for the Debtors and their stakeholders. The Debtors also retained Capstone to commence a formal marketing process in June 2025.

49.    In an effort to address the impending defaults and stabilize their capital structure, the Debtors launched, with Capstone's assistance, a refinancing process

---

[6] *See* Washington State Department of Agriculture, *Washington Agriculture at a Crossroads: A Baseline Assessment of Agricultural Viability in Washington State* (Feb. 2026) (AGR5-2512-009).

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 17

during the fourth quarter of 2024 and into 2025. That effort culminated in extensive and exclusive negotiations with a single interested party that had significant existing investments in the Washington agricultural sector and for which the Debtors' assets would be complementary.

50. Ultimately, these negotiations proved unsuccessful, leaving the Debtors in a severe liquidity crisis just as the 2025 crop harvest was beginning. At that time, the Debtors were operating under short-term forbearance agreements with BMO and Prudential. Both lenders agreed to extend their forbearance periods through August 31, 2025, during which time they would forbear from exercising their rights and remedies under their respective facilities, but only on the condition that the Debtors conduct a concurrent and expediated sale process, encompassing either a sale of the Debtors' assets or an alternative restructuring transaction. BMO also agreed to permit the Debtors' continued use of BMO's cash collateral during the forbearance period.

51. Through Capstone's efforts, the Debtors received four indications of interest from prospective transaction parties in August 2025. Two such proposals were immediately deemed unacceptable, while the remaining two showed potential. With the expiration of the forbearance period approaching, BMO and Prudential each expressed interest in exploring the two remaining out-of-court restructuring proposals and agreed, both formally and informally, to forbear from exercising their respective rights and remedies until approximately November 15, 2025. By the end of 2025, however, neither proposal materialized.

52. In January 2026, the Debtors engaged in extensive discussions with BMO and Prudential regarding the future of the Company, its liquidity situation, and the optimal means of maximizing value for the benefit of creditors and other stakeholders.

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 18

These negotiations included weekly (and at times daily) discussions with BMO concerning the continued use of its cash collateral. The parties considered a range of alternatives, including foreclosure, piecemeal asset sales, receivership, and a chapter 11 filing, weighing which path would best maximize value, whether through a consensual process or the exercise of BMO's and Prudential's remedies.

53. These discussions continued through the end of March 2026, at which point BMO informed the Debtors that no further use of its cash collateral would be permitted, as was its right under the BMO Facilities.

54. The Debtors' liquidity position was further exacerbated by the timing of the Company's seasonal cost cycle: as March 2026 progressed, operating expenses were set to escalate materially on a week-by-week basis with the onset of the crop season.

55. As of late March 2026, the Company appeared destined to transition into either a receivership proceeding or a chapter 11 filing on or around April 1, 2026. However, the Company was able to secure the Crop Loan from Backstop. The Crop Loan was designed to fund the Company's operations through April, thereby affording the Company additional time to delay a chapter 11 filing until May, to continue exploring alternative sources of liquidity, and to fund operations necessary to cultivate the 2026 crop. As a condition to the Crop Loan, the Company was required to prepare for a May 1, 2026, filing, albeit on a very limited budget, and to appoint an independent director, among other conditions, as set forth above.

56. During April and May 2026, Capstone continued to market the Debtors' assets to potential refinancing and restructuring parties. As of the date hereof, the Debtors and Capstone have been in contact with over 80 potentially interested parties

26-01136-FPC11    Doc 10    Filed 06/04/26    Entered 06/04/26 18:23:42    Pg 19 of 57

as part of this prepetition marketing process and entered into 49 nondisclosure agreements. In total, the prepetition marketing process yielded a number of serious expressions of interest, resulting in seven letters of intent. Following evaluation of these proposals, the BHPO's Board of Directors approved a letter of intent (the "LOI") with U.S. Farming Realty Trust III, LP ("U.S. Farming") for a proposed transaction entailing a sale or restructuring of substantially all of the Debtors' assets pursuant to Bankruptcy Code § 363. Subject to Bankruptcy Court approval, U.S. Farming has agreed to serve as the Debtors' stalking horse bidder in these Chapter 11 Cases.

57. The Debtors intend to file a motion seeking approval of bidding procedures designed to promote a fair, transparent, and value-maximizing process, pursuant to which the proposed transaction will be subject to higher and better offers and Bankruptcy Court approval.

58. Concurrently, the Company obtained DIP financing commitments from Sandton Capital Solutions Master Fund VI, LP ("Sandton"), and through the extraordinary efforts of the Company, was able to identify limited additional liquidity through government grants and customer advances sufficient to sustain operations until June 2026.

59. Without immediate access to liquidity, the Debtors cannot fund the imminent 2026 crop harvest, preserve perishable inventory, or maintain the going-concern value necessary to consummate a value-maximizing sale. The Prepetition Credit Facilities have now expired, and both lenders have insisted that any further borrowings by the Debtors be made only within a chapter 11 framework, leaving the Debtors with no practical alternative but to seek the protection of the Bankruptcy

Code. A chapter 11 filing will enable the Debtors to stabilize operations during the critical harvest period, continue the ongoing restructuring process under court supervision, and ultimately maximize value for all stakeholders.

(2)     Goals for These Chapter 11 Cases

60.     The Debtors intend to use these Chapter 11 Cases to stabilize their operations and preserve going-concern value during the 2026 crop season. To that end, the Debtors have secured DIP financing from Sandton and will seek Court approval thereof on an emergency basis to ensure that the Debtors have sufficient liquidity to fund the harvest, maintain perishable inventory, and meet essential operational obligations without interruption.

61.     The Debtors intend to conduct a court-supervised sale process either pursuant to Bankruptcy Code § 363 or a plan. As noted above, the Debtors' Board of Directors approved the LOI with U.S. Farming, which has agreed to serve as the Debtors' stalking horse bidder in these Chapter 11 Cases. The Debtors will seek approval of bidding procedures pursuant to which the proposed transaction will be subject to higher and better offers. The Debtors will also consider bids for discrete asset packages or combinations thereof to maximize recoveries. The prepetition marketing process conducted by Capstone has generated meaningful interest, and the Debtors are optimistic that a competitive auction will ensue.

62.     Ultimately, the Debtors anticipate exiting these Chapter 11 Cases through confirmation of a plan and will work expeditiously toward that end.

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 21

## C. **First Day Pleadings**[7]

(1)    Debtors' *Ex Parte* Application to employ and Retain Stretto, Inc. as Noticing, Claims, Solicitation, and Balloting Agent (the "Claims Agent Retention Application")

63.    Through the Claims Agent Retention Application, the Debtors seek the appointment of Stretto, Inc. as claims and noticing agent in the Chapter 11 Cases. Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate there will be in excess of 200 parties in interest to be noticed. In view of the number of anticipated notice parties, the Debtors submit that the appointment of a claims and noticing agent is necessary and in the best interests of the Debtors' estates and their creditors.

(2)    Debtors' Motion for Interim Order (I) Authorizing the Debtors to Obtain Senior Secured Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Status; (III) Setting a Final Hearing; and (IV) Granting Related Relief (the "DIP Motion")

64.    Through the DIP Motion, the Debtors seek entry of interim and final orders (i) authorizing the debtors to obtain senior secured postpetition financing; (ii) granting liens and superpriority administrative expense status in favor of Sandton; (iii) setting a final hearing; and granting related relief.

65.    The Debtors have insufficient cash to operate their businesses and pay their debts as they come due. The Debtors require immediate access to liquidity to ensure that they can continue operating in these Chapter 11 Cases while they continue a sale and marketing process for their assets. Without prompt postpetition financing, the Debtors do not have sufficient cash to operate their businesses, pay employee wages, or pay other critical business expenses, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders. Thus, if

---

[7] Capitalized terms used in this Section C but not defined herein shall have the meanings ascribed to them in the applicable First Day Pleading.

the Debtors' proposed postpetition financing is not approved, the Debtors will have to shut down or liquidate immediately.

66. The Debtors' management, board, and professionals reviewed restructuring alternatives in detail over the past several months and explored alternative sources of capital and financing, none of which yielded a result that would allow the Debtors to operate outside of chapter 11.

67. Prior to the Petition Date, the Debtors, in consultation with their financial advisors, reviewed and analyzed the Debtors' projected cash needs and prepared a 30-day cash flow projection outlining the Debtors' postpetition cash needs. The Debtors believe that the budget attached to the proposed interim order on the DIP Motion, and the projections set forth therein, provide an accurate reflection of their financing requirements over the identified period, will allow them to meet their obligations, and are reasonable and appropriate under the circumstances.

68. In connection with their preparation of the budget, the Debtors, with the assistance of Capstone, also considered and solicited potential sources of financing that would provide the liquidity necessary to fund these Chapter 11 Cases. No lender was willing to provide an alternative or better proposal to the Debtors' proposed postpetition financing that would support a restructuring of the Debtors' business.

69. Ultimately, the Debtors received an offer from Sandton to provide the postpetition financing necessary to fund the Debtors' operations during the Chapter 11 Cases. Moreover, Sandton's proposal also gained the support and consent of Prudential. These negotiations were conducted at arm's length and in good faith.

70. The proposed postpetition financing and proposed use of cash collateral would enhance the Debtors' ability to minimize disruption to their businesses and

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 23

instill confidence in their various creditor constituencies, including customers, employees, vendors, and service providers.

71. Accordingly, the Debtors have concluded that the benefits of accessing the proposed postpetition financing and use of cash collateral outweigh the modest burdens and expenses imposed by the financing arrangement.

(3) Debtors' Motion for Entry of Order (I) Authorizing Debtors to Continue Using Existing Cash Management System, Bank Accounts, and Business Forms; and (II) Granting Related Relied; Memorandum of Points and Authorities (the "Cash Management Motion")

72. Through the Cash Management Motion, the Debtors seek the entry of an order (i) authorizing the Debtors to continue to use their cash management system, including the continued maintenance of their existing bank accounts and business forms, and (ii) granting related relief.

73. In the ordinary course of business, the Debtors utilize an integrated cash management system to collect, concentrate, and disburse funds generated by or received for its operations (the "Cash Management System"). In broad terms, the Debtors' Cash Management System is similar to the cash management systems used by other business operations of a comparable size and complexity.

74. The Cash Management System is tailored to meet the Debtors' operating needs as an integrated grower, packer, marketer, and shipper of apples and cherries. The Cash Management System enables the Debtors to efficiently collect and distribute cash generated by their business, pay their financial obligations, control and monitor funds available, comply with requirements of their financing arrangements, reduce administrative expenses, and obtain accurate account balances and other financial data. It is critical that the Cash Management System remain intact during the Chapter 11 Cases.

26-01136-FPC11    Doc 10    Filed 06/04/26    Entered 06/04/26 18:23:42    Pg 24 of 57

75. BHPO's finance and accounting department oversees all financial operations for the Debtors, including payroll, accounts payable, accounts receivable, cost accounting, and financial reporting. The cost accounting manager, controller, payroll department, and grower accounting operations team report to the orchard financial manager, financial accountant, and financial manager, as applicable, who ultimately report to me as chief financial officer. The finance and accounting department performs critical cash management functions, including invoice and payment processing and bank account reconciliation. It also maintains controls over the foregoing, including in connection with transactions between the Debtors.

76. The Cash Management System consists of approximately 18 bank accounts (collectively, the "Bank Accounts"), listed and described on **Exhibit A** to the Cash Management Motion. Currently, the Debtors maintain Bank Accounts at five (5) banks: the Bank of Montreal ("BMO"), Wells Fargo Bank, N.A. ("Wells Fargo"), Wheatland Bank, Division of Glacier Bank ("Wheatland"), Columbia State Bank ("Columbia"), and Washington Trust Bank ("WTB," and collectively with BMO, Wells Fargo, Wheatland, and Columbia, the "Banks"). With the exceptions of BMO and Columbia, each of these Banks is designated as an authorized depository by the Office of the United States Trustee for Region 18 (the "U.S. Trustee"). All of the Bank Accounts are operational in nature (e.g., payroll, operating disbursements, and operating deposits).

77. The Debtors' day-to-day financial transactions are largely processed through two Washington Trust checking accounts—accounts ending in 8099 (the "Warehouse Account") and 2272 (the "Orchard Account"). The Warehouse Account serves as the central depository for substantially all cash receipts generated by the

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 25

Debtors' operations. The Orchard Account is used exclusively to satisfy obligations incurred in connection with the Debtors' orchard operations. Cash is transferred from the Warehouse Account or the Orchard Account, as needed, to fund payroll, pay vendors, and satisfy other expenses of the Debtors.

78. Payroll for the Debtors' Orchard Employees, as defined in the Wages Motion, is funded through their sole Wells Fargo account, while payroll for the Debtors' Warehouse Employees, as defined in the Wages Motion, is funded through the Wheatland account ending in 1198.

79. Each of the Debtors' subsidiary entities maintains its own checking account, originally established to collect revenue from the sale of fruit owned by those entities and pay bills related to their respective orchards. However, currently, these accounts have primarily been used to collect USDA program funds. Once those funds are received, they are transferred to the Warehouse Account.

80. In the ordinary course of business, the Debtors maintain and utilize a variety of credit cards to facilitate the efficient operation of their business (the "Corporate Cards"). The Corporate Cards are an integral component of the Debtors' Cash Management System and are used primarily for the purchase of supplies, materials, and fuel necessary for the Debtors' ongoing agricultural and packing operations. The Corporate Cards are issued by several financial institutions and vendors, including Mechanics Bank, WTB, Home Depot, and Exxon, and are connected to various payment networks. Each Corporate Card serves a specific operational need.

81. The Mechanics Bank Visa cards are used by various supervisors for ordering supplies, with two cards currently issued. The average monthly balance on

these cards over the previous twelve months has been approximately $41,500. Similarly, the WTB Visa card, also used for ordering supplies by supervisors, has an average monthly balance of $11,000. For the procurement of materials and supplies, the Debtors utilize Home Depot credit accounts. The Home Depot Warehouse account consists of six (6) cards with an average monthly balance of $3,700. The Home Depot Orchard account includes ten cards with an average monthly balance of $11,000. These cards are distributed among supervisors to ensure timely and efficient purchasing of necessary items for both warehouse and orchard operations.

82. Fuel purchases are managed through Exxon credit accounts, which are critical for the Debtors' large-scale agricultural activities. The Exxon Warehouse account has eighty cards available (not all of which are issued at any given time), with an average monthly balance of $55,000. The Exxon Orchard account provides for 268 cards (again, not all issued simultaneously), with an average monthly balance of $75,000. The office maintains spare cards to promptly replace any that are lost, stolen, or needed for new drivers, ensuring uninterrupted access to fuel for the Debtors' fleet.

83. Each Corporate Card is issued either in BHPO's name or in the name of a designated employee, depending on the specific account. Except for the Home Depot Orchard and Exxon Orchard accounts, all Corporate Card balances are satisfied monthly. The Home Depot Orchard and Exxon Orchard accounts are paid monthly by GFS, which then issues a corresponding invoice to BHPO reflecting the Debtors' supplies, materials, and fuel charges for that period.

84. The Debtors' use of the Corporate Cards is subject to internal controls and approval processes to ensure that all charges are for legitimate business purposes. The Corporate Cards are issued to specific employees or supervisors, who are

responsible for adhering to the Debtors' expense policies. The continued use of the Corporate Cards in the ordinary course of business, including the payment of any prepetition and postpetition amounts due and owing thereunder, is essential to maintaining the Debtors' operations and minimizing disruption during the Chapter 11 Cases.

85. As of the Petition Date, there are approximately 250 Corporate Cards in use by the Debtors' employees across many aspects of the Debtors' business. The average monthly aggregate balance on the Corporate Cards is approximately $33,000.

86. The Debtors maintain relationships with each other in the ordinary course of business (the "Intercompany Transactions") that result in intercompany receivables and payables (the "Intercompany Claims").

87. In connection with the daily operation of the Cash Management System, as funds are disbursed through the Cash Management System and as business is transacted among the Debtors, at any given time there may be an Intercompany Claim owed by one Debtor to another, which allows the Debtors to facilitate and maintain their operations. The Intercompany Claims are generally reflected as journal entry payables and receivables each month. Further, each Debtor tracks all fund transfers in its respective accounting system and can ascertain, trace, and account for all Intercompany Transactions. Indeed, the Debtors' general practice is to maintain schedules that record all cash activity in the Bank Accounts and to reconcile such amounts with the Debtors' books and monthly cash balance.

88. If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders. Moreover, the

Intercompany Transactions ultimately result in a net benefit to the Debtors. Accordingly, the Debtors seek authority to continue the Intercompany Transactions in the ordinary course of business consistent with past practice.

89. For the foregoing reasons, it is in the best interest of the Debtors that the Court approve the continued use of the Cash Management System as described in the Cash Management Motion.

(4) Debtors' Motion for Entry of Order (I) Authorizing Debtors to (A) Pay Employee Obligations, and (B) Continue Compensation and Benefits Programs; and (II) Granting Related Relief (the "Wages Motion")

90. Through the Wages Motion, the Debtors seek the entry of an order (i) authorizing, but not directing, the Debtors, in their sole discretion, to (a) pay Wages (defined below) and related expenses (collectively, "Employee Obligations") arising under or related to Compensation and Benefits Programs (as defined below) and (b) continue their Compensation and Benefits Programs in effect as of the Petition Date (and as may be amended, renewed, replaced, modified, revised, supplemented, and/or terminated from time to time in the ordinary course of business) and pay related administrative obligations; and (ii) granting related relief as the Court deems just and proper under the circumstances.

91. On the Petition Date, the Debtors employed roughly 3,686 hourly workers (the "Hourly Employees") and 56 salaried workers (the "Salaried Employees," and together with the Hourly Employees, the "Employees").

92. The 3,686 Hourly Employees are split between those who work mainly in the warehouse (the "Warehouse Employees") and those who work mainly in the orchards (the "Orchard Employees"). Warehouse Employees handle a broad set of duties, such as operating forklifts, driving trucks, working as shipping and receiving

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 29

clerks, performing repairs and maintenance, and supporting accounting. Orchard Employees similarly carry out a range of necessary work, including picking fruit, pruning, thinning, and related orchard activities, and they also staff the shop department. None of the Employees belong to a union.

93. A large share of the Debtors' Employees work under the "H-2A Program," a U.S. Department of Labor visa program that allows U.S. employers to bring on workers for temporary agricultural positions (such Employees, the "H-2A Employees"). On average, the Debtors may have approximately 3,500 H-2A Employees in a given year. For calendar year 2026, the Debtors expect to employ roughly 3,459 H-2A Employees. The H-2A Employees, who are predominantly Orchard Employees, typically arrive sometime between March and June and leave when the season ends, generally on or about November of each year. As of the Petition Date, some of the H-2A Employees have not yet arrived. The Debtors expect roughly 514 more H-2A Employees to arrive during calendar year 2026.

94. Every function carried out by the Debtors' Employees is vital to preserving value and administering the Debtors' estates. In many cases, the Employees include staff who know the Debtors' facilities, processes, systems, and business in depth. Many have built up detailed knowledge of the Debtors' farming and logistics operations, along with the relationships with customers, suppliers, and other key counterparties that the Debtors' business depends on. These Employees are difficult to replace, and without their continued, uninterrupted service, the Debtors' operations would stop at once and administration of the estates would suffer material and irreparable harm.

95. The Employees depend on their pay and benefits to cover their everyday living costs. Not only would these Employees be irreparably harmed if the Debtors could not keep paying compensation, including the Employee Obligations, and providing health and other benefits during these Chapter 11 Cases, but any break in payment would also likely endanger their ongoing performance and loyalty to the Debtors. For these reasons, the Debtors respectfully submit that the relief sought in the Wages Motion is necessary and appropriate given the facts and circumstances of these Chapter 11 Cases.

96. In the ordinary course of business, the Debtors make various payments, contributions, deductions, and withholdings under or connected to Wages; Payroll Processing; Deductions, Withholdings, and Taxes; the H-2A Program; Reimbursable Expenses; Health Care Benefits; Insurance Plans; COBRA Benefits; the 401(k) Plan; Paid Leave; and the Other Benefit Programs (each defined below and, together, the "Compensation and Benefits Programs") for current and certain former Employees, as applicable.

97. Hourly employees assigned to the orchards work not only for the Debtors but may also supply labor to the Affiliated Farms. As described more fully in the GFS Motion (as defined below), GFS manages the costs tied to the H-2A Program, including yearly billing and the allocation of costs borne by the Debtors and each Affiliated Farm according to acres farmed. And as detailed in the Apple House Assumption Motion (as defined below), Apple House may pay directly, or reimburse BHPO for, all labor, utility, supply, storage, packing, and related costs and expenses arising from Apple House's use of BHPO's personnel, facilities, and supplies in operations under the Grower Contract described herein.

98. The Debtors owe their Employees obligations including, among other things, wages, salaries, overtime, accrued ordinary course bonuses, and the other obligations described below (together, the "Wages"). The Debtors' Hourly Employees receive their Wages, net of any applicable Deductions and Withholdings (each defined below), every two weeks in arrears for the two-week span ending the prior Saturday. The Debtors' Salaried Employees receive their Wages, net of any applicable Deductions and Withholdings, twice a month. The Debtors' average monthly Hourly Employee payroll swings widely across the year with labor demand, ranging from about $2,500,000 in November to $11,500,000 in July. The Debtors' average monthly Salaried Employee payroll stays relatively steady at roughly $600,000 (inclusive of Withholding Obligations but exclusive of payments tied to Health Care Benefits, each discussed below).

99. The next Hourly Employee payroll will fall on June 11, 2026, covering the period from May 24 to June 6, 2026. The Debtors estimate paying Hourly Employees roughly $3,000,000 for that pay period. The next Salaried Employee payroll will fall on June 15, 2026, covering the period from June 1 to June 15, 2026. The Debtors estimate paying roughly $300,000 to the Salaried Employees for that pay period. Orchard Employees are paid their Wages by check. Warehouse Employees are paid through a mix of ACH and check. Apart from one Employee, Salaried Employees are paid by ACH.

100. The Debtors estimate that, as of the Petition Date, they owe roughly $2,200,000 in prepetition unpaid Wages to Employees (the "Unpaid Compensation"), all of which will come due within the first thirty (30) days of these Chapter 11 Cases (the "Interim Period"). A failure to pay the Unpaid Compensation would create

financial hardship for the Employees and would very likely trigger broad departures throughout every level of the Debtors' corporate structure. Given the considerable benefit the Employees will keep providing to the Debtors' estates and the cost of filling abrupt vacancies, the Debtors wish to avoid imposing that hardship. No Employee is owed wages above the $17,150 statutory cap.

101. For payroll processing, the Debtors rely on two in-house software systems, Spokane Software and NovaTime. As a result, the Debtors bear no costs to support payroll processing. As noted in the Cash Management Motion, Warehouse Employee payroll is funded from the Debtors' Wheatland account ending in 1198, and Orchard Employee payroll is funded from the Debtors' Wells Fargo account ending in 7045. Salaried Employee payroll is funded from the Debtors' Wheatland Bank Account ending in 1198.

102. For each relevant pay period, the Debtors regularly withhold certain amounts from Employee paychecks, including, without limitation, garnishments, child support and comparable deductions, as well as pre- and after-tax deductions owed under certain of the Compensation and Benefits Programs discussed here (such as an Employee's portion of health care insurance premiums, health savings plan contributions, 401(k) contributions, legally mandated deductions, and miscellaneous deductions) (together, the "Deductions"), and remit those amounts to various third-party recipients.

103. Beyond the Deductions, federal and state law obligate the Debtors to withhold amounts for federal, state, and local income taxes and for Social Security and Medicare taxes to remit to the proper federal, state, or local taxing authority (together, the "SS and Medicare Withholdings"). The Debtors must then match the

withheld Social Security and Medicare amounts from their own funds and pay, as a percentage of gross payroll, additional amounts for federal and state unemployment insurance (discussed below). For the upcoming payrolls on June 11, 2026, and June 15, 2026, the Debtors expect to remit roughly $275,000 in SS and Medicare Withholdings to federal and state taxing authorities. The SS and Medicare Withholdings are typically processed and forwarded by the Debtors through their in-house software to the appropriate federal, state, and local taxing authorities at the same time the Employees' payroll is disbursed.

104. The Debtors are also responsible for remitting amounts withheld from Employees' payroll for the Washington State Paid Family and Medical Leave ("PFML") program (the "PFML Taxes"). The PFML program gives eligible employees paid leave for qualifying family and medical reasons, and the Debtors' compliance with these obligations is critical to keeping Employees' access to these important benefits intact. On average, the Debtors pay roughly $802,000 in PFML Taxes each year. These payments are payroll taxes deducted from Employees' Wages and remitted to the State of Washington, as Washington law requires. The Debtors accordingly request authority, but not direction, to keep withholding, remitting, and/or paying all prepetition and postpetition amounts relating to PFML Taxes in the ordinary course of business, in line with past practice.

105. Washington law further requires the Debtors to fund the State's workers' compensation system, run by the Washington State Department of Labor & Industries, by paying industrial insurance taxes ("Industrial Insurance Payables"). These Industrial Insurance Payables consist of both employer contributions and the employee-paid portion that the Debtors withhold and remit, and they fund wage-loss,

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 34

medical, and disability benefits for employees who sustain work-related injuries or occupational diseases. Historically, the Debtors have paid an average of roughly $3,385,000 per year in Industrial Insurance Payables. Paying these taxes on time is mandatory and essential to keeping employees' statutory coverage in place and avoiding penalties and interest. The Debtors accordingly request authority, but not direction, to keep withholding, remitting, and/or paying all prepetition and postpetition amounts relating to Industrial Insurance Payables in the ordinary course of business, consistent with past practice.

106. Taken together, the Debtors remit roughly $450,000 per pay period (covering both the Employee and employer portions) for the Deductions, SS and Medicare Taxes, PFML Taxes, and Industrial Insurance Payables (together, the "Withholding Obligations").

107. The Debtors further seek authority, but not direction, to forward any Withholding Obligations (and to keep forwarding the Withholding Obligations on a postpetition basis, whether or not they relate to the prepetition period) to the relevant third-party recipients in the ordinary course of business and consistent with past practice.

108. As noted above, each year the Debtors employ roughly 3,000-4,000 H-2A Employees, mainly from Mexico and Jamaica, to help with various aspects of growing cherries, apples, and pears.

109. To help recruit Employees abroad, the Debtors use certain agencies, including the Worker and Farmer Labor Association ("WAFLA"), which arranges and assists with recruiting the H-2A Employees from Mexico (the "Mexican Employees"). WAFLA handles the visas and transportation for the Mexican

26-01136-FPC11    Doc 10    Filed 06/04/26    Entered 06/04/26 18:23:42    Pg 35 of 57

Employees (the "WAFLA Program"). WAFLA bills for its services on a per-Employee basis. In calendar year 2025, WAFLA received $4,071,588 for its services, covering the application fees and worker fees for roughly 3,113 Mexican Employees. For calendar year 2026, the Debtors estimate the WAFLA Program will cost roughly $4,184,435 to cover the application fees and worker fees for roughly 3,065 Mexican Employees.

110. The Debtors also separately contract with the Jamaican government and Florida East Coast Travel Services Inc. ("FEST," and together with WAFLA and the Jamaican government, the "Foreign Worker Agencies") for additional H-2A Employees from Jamaica (the "Jamaican Employees"). For the Jamaican Employees, the Debtors cover processing fees, visa reimbursements, transportation to and from Jamaica, and food. In calendar year 2025, the Jamaican government and FEST received a combined $566,700 to cover these expenses for roughly 364 Jamaican Employees. For calendar year 2026, the Jamaican government and FEST are estimated to receive roughly $566,700 for 364 Jamaican Employees.

111. The Debtors also incur other costs tied to the H-2A Program, including housing, food, administration, professional fees, supplies, and miscellaneous expenses (the "Miscellaneous H-2A Program Expenses"). In calendar year 2025, the Miscellaneous H-2A Program Expenses came to $299,385. For calendar year 2026, the Debtors estimate Miscellaneous H-2A Program Expenses will be roughly $305,465.

112. BHPO initially funds the H-2A Program, but because the H-2A Employees are shared among the Debtors and various non-Debtor third parties, the costs (the "H-2A Program Costs") are allocated by acreage. The Debtors bear 54.3%

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 36

of all costs associated with the H-2A Program. In calendar year 2025, the Debtors incurred $2,755,330 in H-2A Program Costs, and for 2026 the Debtors estimate their share of the H-2A Program Costs will total roughly $2,749,965. Each H-2A Program participant pays its estimated portion of the H-2A Program Costs at the start of the season. Costs are trued-up when the season ends.

113. The Debtors do not believe any amounts remain due and owing to the Recruiting Agencies for prepetition H-2A Program Costs.

114. In the ordinary course of business, the Debtors reimburse certain Employees for approved costs incurred in performing their assigned duties for the Debtors, including mileage reimbursement, the H-2A Stipend discussed below, and a uniform stipend (together, the "Reimbursable Expenses").

115. The H-2A Employees receive a modest stipend of roughly $34.00 when they depart, to cover travel and meals (the "H-2A Stipend"). In addition, roughly 10-12 employees receive reimbursement of up to $1,000 per year toward their uniforms to ensure safe work attire. The Reimbursable Expenses are ordinary course costs that Employees incur in doing their jobs and are essential to keeping the Debtors' business running and preserving the value of the Debtors' estates. Allowing the Debtors to keep reimbursing Employees for these Reimbursable Expenses is likewise essential to the continued operation of the Debtors' business.

116. The Debtors estimate that, in the aggregate, Employees incur on average roughly $250-300 per month in Reimbursable Expenses, not counting the H-2A Stipend. While the Debtors ask Employees to submit reimbursement requests promptly, not all of them do. The Debtors estimate they may owe up to roughly $5,000

in Reimbursable Expenses from the prepetition period that will fall due during the Interim Period.

117. The Debtors give eligible Employees the chance to take part in a range of insurance and benefit programs, including, but not limited to, health, dental, vision, life, and disability insurance, a 401(k) savings plan, and other similar programs. Certain of these benefits call for payments by the Debtors and may be unpaid as of the Petition Date because some obligations may have accrued in whole or in part before the Petition Date but will not become payable in the ordinary course of the Debtors' businesses until after the Petition Date. The various Employee benefits are described below.

118. In the ordinary course of their business, the Debtors give Employees the chance to take part in a number of health benefit plans, including medical, dental, and vision plans (together, the "Health Care Benefits"). Specifically, the Debtors provide the following:

    a. <u>Medical Plans</u>: The Debtors offer medical insurance through Healthcare Management Administrators ("HMA"). Through HMA, the Debtors maintain two (2) self-insured medical plans, including a High-Deductible Health Plan with a Health Savings Account feature, which is 100% employee-funded, and a PPO Classic Plan (together, the "HMA Plans"). Costs under the HMA Plans are paid by both Employees and the Debtors. On average, the Debtors contribute roughly $120,000 to the HMA Plans each month. As of the Petition Date, the Debtors owe roughly $120,000 for prepetition contributions on account of the HMA Plans.

b. <u>Vision and Dental Plans</u>: The Debtors provide vision and dental coverage to Employees through MetLife (the "MetLife Plan") via GFS. Costs under the MetLife Plan are paid by Employees. As of the Petition Date, the Debtors believe all Employee remittances on account of the MetLife Plan are current, and roughly $0 of Employee payments will be remitted during the Interim Period.

c. <u>FSA Plan</u>: Employees may also contribute funds for healthcare spending to a Flexible Spending Account administered by Health Equity (the "FSA Plans"). The Debtors do not contribute additional amounts to the FSA Plans. The Debtors' cost for Health Equity to administer the FSA Plans is roughly $300 in the aggregate per year. Historically, when Employees did take part in the FSA Plans, they made weekly contributions averaging roughly $315 per week. The Debtors believe that, as of the Petition Date, no Employee is expected to contribute during the Interim Period.

119. The Debtors provide certain Employees with basic life insurance and accidental death and dismemberment insurance under policies administered by MetLife (together, the "Insurance Plans"). At present, roughly 155 Employees take part in the Insurance Plans. The Debtors pay MetLife roughly $4,828 each month to administer the Insurance Plans. As of the Petition Date, the Debtors believe they are current on payments on account of the Insurance Plans, and roughly $4,828 will fall due during the Interim Period.

120. In the ordinary course of business, the Debtors make payments under Section 4980B of the Internal Revenue Code to administer Continuation Health

26-01136-FPC11    Doc 10    Filed 06/04/26    Entered 06/04/26 18:23:42    Pg 39 of 57

Coverage (26 U.S.C. § 4980B) ("COBRA") for qualifying Employees and their qualifying dependents who experience a COBRA qualifying event or loss of coverage tied to a self-insured benefit plan (the "COBRA Benefits"). Rehn & Associates administers the Debtors' COBRA Benefits, and one employee currently receives COBRA benefits. The Debtors' cost for Rehn & Associates to administer the COBRA Benefits is roughly $700 per year.

121. The Debtors estimate that, as of the Petition Date, they are current on payments on account of the COBRA Benefits.

122. Eligible Employees take part in a 401(k)-retirement savings plan. The 401(k) Plan, administered by John Hancock, lets qualified, participating Employees defer a portion of their salary to help meet their financial goals and build savings for the future through either a traditional 401(k) deferral or a Roth 401(k) deferral. The Debtors collect contributions from eligible, participating Employees each payroll cycle and move those contributions into the 401(k) Plan as the Employees direct, right after the applicable payroll is processed and closed. As of the Petition Date, the Debtors believe all such amounts collected from Employees have been transferred into the 401(k) Plan. The Debtors estimate, however, that roughly $57,480 in Employee 401(k) Plan contributions will be remitted during the Interim Period.

123. The Debtors make certain matching contributions on a dollar-for-dollar basis of up to three percent (3%) in connection with Employees' participation in the 401(k) Plan (the "401(k) Matching Contributions"). For Employee deferrals between three percent (3%) and five percent (5%) of compensation, the Debtors provide a $0.50 match for each dollar contributed. The 401(k) Matching Contributions are applied monthly and total roughly $22,670 in the aggregate per month. As of the

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 40

Petition Date, the Debtors believe they are current on all 401(k) Matching Contributions. The Debtors estimate, however, that roughly $22,670 in 401(k) Matching Contributions will fall due during the Interim Period.

124. The Debtors provide eligible Employees with vacation ("Vacation Time"), paid holidays ("Holiday Time"), and paid sick leave ("Sick Time," and together with Vacation Time and Holiday Time, "Paid Leave"). Salaried Employees are eligible for 10 vacation days of Vacation Time and 10 days of Sick Time. Hourly Employees are eligible for 10 days of Vacation Time and one hour of Sick Time per 40 hours worked. Paid Leave is provided annually and may be rolled over up to 40 hours. As of the Petition Date, the accrued and unused Vacation Time for all Employees was roughly $600,000, or 11,400 total hours.

(5)     Debtors' Motion for Order Approving Adequate Assurance to Utilities Pursuant to 11 U.S.C. § 366 on an Interim Basis (the "Utilities Motion")

125. Through the Utilities Motion, the Debtors seek entry of an order (i) prohibiting utilities from altering, refusing, or discontinuing service; (ii) determining adequate assurance of payment for future utility services; and (iii) granting related relief.

126. In connection with the operation of their business, the Debtors receive water, sewer service, electricity, waste disposal, natural gas, telecommunication, and other similar services (collectively, the "Utility Services") from a number of utility providers (each, a "Utility Provider" and collectively, the "Utility Providers").

127. A list of the Utility Providers that provide Utility Services to the Debtors as of the Petition Date is attached as Exhibit A to the Utilities Motion.

128. The relief requested herein is with respect to all Utility Providers supplying Utility Services to Debtors.

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 41

129. Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and, hence, the overall success of the Chapter 11 Cases.

130. As of the Petition Date, the Debtors' business includes multiple parcels of real property owned by the Debtors and certain non-Debtor affiliates, all of which locations require the Utility Services provided by the Utility Providers to operate. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business–especially as it relates to the Debtors' ability to operate their various orchards and warehouses–would be severely impacted, and any such disruption would negatively affect the Debtors' revenues and jeopardize their ability to administer these Chapter 11 Cases. Accordingly, it is essential that the Utility Services continue uninterrupted during the Chapter 11 Cases.

131. The Debtors intend to pay postpetition obligations to the Utility Providers in a timely manner. Cash held by the Debtors, cash generated in the ordinary course of business, and cash available to the Debtors under any proposed postpetition financing will provide sufficient liquidity to pay the Debtors' Utility Services obligations in accordance with their prepetition practices.

132. To provide additional assurance of payment, the Debtors propose to deposit $223,599.16 (the "Adequate Assurance Deposit") into a segregated account (the "Adequate Assurance Account"), which represents an amount equal to approximately one-half of the Debtors' monthly cost of Utility Services as identified on Exhibit A to the Utilities Motion.

133. The Debtors propose to fund the Adequate Assurance Deposit within five (5) business days after the Court's entry of an order granting the Utilities Motion. The Debtors request the authority to adjust the amount of the Adequate Assurance Deposit

to account for the termination of certain Utility Services by the Debtors on account of any closed business locations or by agreement between the Debtors and the affected Utility Provider without further order of the Court, as long as there is no dispute regarding postpetition amounts owing to such Utility Provider.

134. The Adequate Assurance Deposit will be held in the Adequate Assurance Account by the Debtors, and no liens will encumber the Adequate Assurance Deposit or the Adequate Assurance Account. The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in accordance with their prepetition practices, constitutes sufficient adequate assurance to the Utility Providers in satisfaction of Bankruptcy Code § 366.

(6)     Debtors' Motion for Entry of Order Authorizing Payment of Prepetition Critical Vendor Claims and 503(b)(9) Claims in the Ordinary Course of Business ("Critical Vendors Motion")

135. Through the Critical Vendors Motion, the Debtors seek entry of an order (i) establishing procedures pursuant to which the Debtors may engage in discussions with counterparties that may qualify as Critical Vendors (defined below) regarding the validity and amount of their respective claims and to determine whether any such counterparties are Critical Vendors, and (ii) authorizing, but not directing, the Debtors to pay, in their sole discretion, prepetition obligations related to Critical Vendors and valid claims of vendors under Bankruptcy Code § 503(b)(9) (each a "503(b)(9) Claim") in the ordinary course of business.

136. In connection with the normal operation of their businesses, the Debtors purchase or contract for goods and services necessary for the Debtors' regular fruit growing and packing operations including but not limited to chemicals, fertilizer,

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 43

packing supplies, irrigation supplies, equipment supplies and other operational necessities.[8]

137. The vendors and independent contractors are, by and large, the limited source for materials or services, or services needed for compliance with certain laws and regulations, and/or provide material economic or operational advantages when compared to other available vendors (the "Critical Vendors"). The lack of any of their particular goods or services, even for a short duration, could significantly disrupt the Debtors' operations and cause irreparable harm to the Debtors' businesses.

138. The Debtors recognize that their fiduciary duties require them to consider and plan for the vendors that may refuse to provide future goods or services unless their prepetition claims are paid. Replacement vendors, even if available, would likely result in substantially higher costs for the Debtors and severe operational disruption. Moreover, replacement vendors may lack knowledge of the Debtors' operations.

139. As a consequence of the commencement of the Bankruptcy Cases, the Debtors believe that many of the Critical Vendors may have significant concerns regarding payment of their prepetition claims such that they may refuse to provide goods or services to the Debtors (or may recall shipments) unless the Debtors obtain an order from the Court authorizing the Debtors, in their sole discretion, to satisfy those obligations in the ordinary course of their businesses.

---

[8] In many instances, the Debtors receive invoices from vendors covering goods and related services, such as when a vendor both sells a good and installs it at one of the Debtors' locations. To the extent that the Debtors in good faith are unable to ascertain the portion of such invoices that is on account of goods and the portion that is on account of services, the Debtors hereby request authority to pay the full amount of such invoices.

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 44

140. The Debtors estimate that the maximum amount that will be needed to pay claims of Critical Vendors (the "Critical Vendor Claims") is approximately $3.5 million (the "Critical Vendor Claims Cap").

141. The Debtors also believe that a significant portion of their outstanding accounts payable as of the Petition Date are entitled to administrative expense priority pursuant to Bankruptcy Code § 503(b)(9) as goods received by the Debtors in the ordinary course of business during the 20 days prior to the Petition Date (each, a "503(b)(9) Claim"). The Debtors estimate that up to $750,000 (the "503(b)(9) Claim Cap") of the outstanding $20,000,000+ in prepetition vendor claims constitute 503(b)(9) Claims. Many of these claims also constitute Critical Vendor Claims, however, the amounts are calculated separately.

142. The Debtors seek authority to pay Critical Vendor Claims and 503(b)(9) Claims as described herein. The Debtors are not seeking to pay Critical Vendor Claims or 503(b)(9) Claims immediately or in one lump sum, but seek and intend to pay the amounts, in their sole discretion, as they become due and payable in the ordinary course of business operations.

143. The Debtors' cash on hand, the cash generated by the Debtors' business, and the proceeds of the proposed postpetition financing will provide liquidity for payment of the Critical Vendor Claims, the 503(b)(9) Claims and the ongoing obligations of their continued operations in the ordinary course.

(7) Debtors' Motion to Assume Grower Contract (the "Apple House Assumption Motion")

144. Through the Apple House Assumption Motion, the Debtors seek entry of an order (i) authorizing the Debtors to assume the Grower Contract (the "Grower

Contract"); and (ii) granting such other and further relief as the court deems just and proper.

145. On or about February 11, 2026, BHPO, as grower, and Apple House Warehouse & Storage, Inc. ("Apple House"), as packer, entered into that certain Grower Contract, pursuant to which Apple House agreed to receive, handle, pack, store, and market certain varieties of apples and pears grown by BHPO (the "Fruit") at BHPO's facilities. The Grower Contract is structured as a consignment arrangement. Apple House does not acquire ownership of or title to the Fruit, and title to the Fruit and all proceeds of sale remain with BHPO at all times.

146. Under the Grower Contract, BHPO receives a proportionate share of the proceeds from the sale of the Fruit, net of Apple House's fee for handling and marketing services, including packing, warehousing, storage, and selling costs (the "Apple House Fee"). Apple House has engaged Gwin, White & Prince, Inc. ("GWP") as its sales desk to market and sell fruit produced, packed, and warehoused by Apple House, including the Fruit sold on BHPO's behalf, and consented to GWP using Chelan Fresh as GWP's sales desk to market and sell the same. Apple House is authorized to pay directly, or reimburse BHPO for, all labor, utility, supply, storage, packing, and related costs and expenses attributable to Apple House's use of BHPO's personnel, facilities, and supplies in the conduct of operations under the Grower Contract.

147. The Grower Contract expressly permits BHPO to grant a security interest in the Fruit to creditors extending credit in connection with the growing of the Fruit, and the parties acknowledged that Apple House would be entitled to a crop lien in the Fruit as a "handler" in accordance with RCW 60.11. In connection with the Grower

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 46

Contract, on or about February 12, 2026, BMO, as administrative agent for the lenders party to the Syndicated Facility, and Apple House entered into that certain Lien Priority and Control Agreement (the "LPCA"). The LPCA governs the relative priority of liens and the handling of proceeds arising from the Fruit delivered by BHPO to Apple House under the Grower Contract.

148. Under the LPCA, subject to certain limitations therein, all lien rights of Apple House, other than the statutory handler's lien under RCW 60.11, are subordinated to BMO's lien on all Fruit delivered by BHPO to Apple House, including all packed product derived therefrom, and all proceeds thereof, including all accounts, payment intangibles, chattel paper, deposit accounts, and general intangibles arising from the sale of the Fruit (collectively, the "Collateral" under the LPCA). The LPCA further establishes a proceeds waterfall under which all collections from the sale of the Fruit are first applied to the Apple House Fee, with the remainder being deposited into a designated control account at BMO and applied first to BMO in reduction of the obligations under the BMO Facilities and thereafter as directed by BMO.

149. The Grower Contract runs through December 31, 2026, and, for so long as BMO remains BHPO's agent under its working capital line of credit, Apple House may exercise its termination right only at BMO's request and with BMO's written consent.

150. The Grower Contract is integral to the continued operation of BHPO's business. It is the vehicle through which BHPO's Fruit is brought to market and revenue is generated for the 2025 crop year, and the LPCA ensures that the resulting proceeds are properly channeled to satisfy BMO's secured claims and Apple House's

handling charges.  Absent assumption of the Grower Contract, BHPO would lose its primary means of packing, marketing, and selling its Fruit, placing the estates' principal assets at risk of diminution in value. The Debtors have concluded, in the exercise of their business judgment, that assumption of the Grower Contract is necessary and appropriate to preserve the going-concern value of the Debtors' estates and to maximize recoveries for creditors.

(8)    Debtors' Motion for Entry of an Order Authorizing the Debtors to Continue Transacting Business with Gebbers Farm Services, LLC in the Ordinary Course of Business (the "GFS Motion")

151. Through the GFS Motion, the Debtors seek entry of an order (i) authorizing the Debtors to continue transacting business with GFS in the ordinary course of business on the same terms and conditions as existed prior to the Petition Date; (ii) authorizing the Debtors to pay  postpetition obligations to GFS as they come due in the ordinary course; (iii) authorizing all banks and financial institutions to receive, process, honor, and pay any and all checks, wire transfers, ACH transactions, and other forms of payment on account of obligations to GFS authorized hereunder; (iv) authorizing the Debtors and GFS to continue netting, reconciling, and offsetting mutual obligations in the ordinary course consistent with prepetition practice; (v) finding that amounts paid by the Debtors to GFS on account of allocated vendor costs constitute indirect payments to the Debtors' third party vendors through GFS as paying agent and administrative conduit; and (vi) granting such other and further relief as the court deems just and proper.

152. As described in Section A(1) of this Declaration, the Debtors' operations are conducted on or around properties that are adjacent to or nearby other farms owned or operated by Affiliated Farms in and around Brewster, Washington. Given

the proximity of these operations and the shared nature of certain resources and infrastructure, the Debtors and the Affiliated Farms have long shared certain operating costs. To streamline this arrangement, in May 2025, BHPO, the Gebbers family, and the Affiliated Farms formed GFS to serve as a centralized cost-sharing vehicle. Prior to the formation of GFS, BHPO paid the common expenses directly, effectively advancing funds on behalf of the Affiliated Farms. With GFS in place, that practice has been eliminated. GFS pays the shared operating costs up front on behalf of the Debtors and the Affiliated Farms, aggregates those expenditures, and at month-end issues a single invoice to BHPO and each Affiliated Farm for its allocable share.

153. GFS provides essential centralized administrative and cost-allocation services to the Debtors in the ordinary course of the Debtors' farming operations, including: (i) insurance program administration, encompassing a range of policies covering the Debtors' orchards, warehouses, and related agricultural infrastructure, allocated based on acreage; (ii) H-2A Program cost management, overseeing costs associated with seasonal agricultural labor and allocating those costs among the Debtors and Affiliated Farms based on acres farmed; (iii) helicopter cherry drying services, coordinating the deployment of helicopters over cherry orchards to prevent crop loss from moisture damage and allocating standby and flight time costs; (iv) irrigation district expenses, managing water supply costs from local irrigation districts and allocating charges based on acreage; (v) equipment repair cost tracking, maintaining a centralized repair operation and billing costs directly to the owner of the equipment serviced; and (vi) shared overhead allocations, administering monthly allocations of general labor, office labor, management labor, employee benefits,

utilities, fuel, rents, employee safety expenses, supplies, legal services, housing rents, housing repairs, housing utilities, property taxes, and equipment rent, using acreage or labor hours as allocation metrics.

154. In addition to performing these cost-allocation services, GFS serves as a centralized paying agent for certain of the Debtors' vendor obligations. Under the GFS structure, GFS directly remits payment to a number of vendors and service providers on behalf of the Debtors and the Affiliated Farms, even where one of the Debtors is the named contract party. GFS thereafter allocates and bills each entity for its proportionate share of the costs actually incurred. Amounts remitted by the Debtors to GFS in many instances do not constitute payments to GFS on its own account but rather represent the Debtors' indirect payment of obligations owed to third-party vendors and service providers. Importantly, with one exception for equipment repair services where GFS charges a markup, GFS does not operate as a profit center; it functions solely as an administrative pass-through entity that allocates actual costs incurred among the Debtors and the Affiliated Farms on an equitable basis.

155. Continuation of the Debtors' transactions with GFS in the ordinary course of business is necessary to preserve the going-concern value of the Debtors' estates. The centralized cost-sharing arrangement administered by GFS allows the Debtors to maintain an orderly, transparent, and accurate accounting for shared expenses across operations that are operationally interrelated. Without GFS, the Debtors would be required to independently perform complex cost-accounting, allocation, and billing functions, or retain third party providers at potentially greater expense, at a time when the Debtors' resources should be focused on restructuring and maximizing value for creditors. Any disruption to GFS's services would impair the Debtors' ability to

operate, maintain their workforce, manage their agricultural properties, and preserve the value of the estates for the benefit of all creditors. The Debtors have concluded, in the exercise of their business judgment, that continued participation in the GFS cost-sharing arrangement is in the best interests of the Debtors' estates and their creditors.

(9) Debtors' Motion for entry of Case Management Order ("Case Management Motion")

156. Through the Case Management Motion, the Debtors seek entry of an order approving and implementing certain notice, case management, and administrative procedures. Specifically, the Debtors seek to limit the scope of service of all notices, motions, or applications, and their related declarations, exhibits or orders.

157. There are in excess of 200 creditors, equity holders, and other parties-in-interest in these Chapter 11 Cases. The cost of copying and mailing to all parties on the mailing matrix will be significant. Mailing each notice in these Chapter 11 Cases to each creditor will not be the best use of the limited estate resources or maximize value for creditors.

158. The Debtors believe that the notice procedures outlined in the Case Management Order should be implemented to establish an efficient protocol to provide notice to interested parties in these Chapter 11 Cases. Accordingly, under the circumstances, the Debtors request that the notice procedures outlined in the Case Management Order be implemented to establish an efficient protocol to provide notice to interested parties in these Chapter 11 Cases.

(10) Debtors' Emergency Motion to Extend Time to File Schedules and Statements ("Motion to Extend Time")

159. Through the Motion to Extend Time, the Debtors seek for entry of an order extending and establishing a deadline by which each Debtor must file its requisite schedules of assets and liabilities (the "Schedules) and statement of financial affairs (the "SOFA") required under Bankruptcy Rule 1007(b) to July 17, 2026.

160. The Debtors' Schedules and SOFAs are due on or before June 18, 2026. Additional time is needed to prepare the Schedules and SOFA for each Debtor, given the emergent filing of these Chapter 11 Cases.

161. These Chapter 11 Cases are extremely complex, involving hundreds of interested parties, sophisticated and complicated organizational structures, and substantial business operations. Further, the Debtors have filed these Chapter 11 Cases with limited resources, which has prevented them from preparing their Schedules and SOFAs.

162. Presently, the Debtors are in the process of preparing their Schedules and SOFAs and require additional time to prepare and file their respective Schedules and SOFAs.

163. If forced to file their Schedules and SOFAs by the existing deadline under the Bankruptcy Rules, it is very likely that one or more Debtors will later have to revise their Schedules or SOFAs. Doing so will require the Debtors and their professionals to spend additional time and effort, ultimately increasing the administrative expenses of the Debtors' estates.

164. As such, the Debtors believe that an extension of time to file their Schedules and SOFA is reasonable and appropriate under the circumstances.

DECLARATION OF BROOKE MCGUIRE
IN SUPPORT OF FIRST DAY PLEADINGS - 52

165. The Debtors have narrowly tailored the First Day Pleadings to meet their goals of: (i) continuing their current operations in chapter 11 with as little disruption as possible; (ii) maintaining the confidence and support of their key partner, customer and employee constituencies; and (iii) establishing procedures for the efficient administration of the Chapter 11 Cases.

166. I have reviewed each of the First Day Pleadings (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate reliance on corporate officers, employees, and advisors. I incorporate by reference the factual statements set forth in each of the First Day Pleadings as though set forth herein.

167. It is my belief that the relief sought in each of the First Day Pleadings is necessary to the successful implementation of the Debtors' efforts to maximize their creditors' recoveries. It is my further belief that, with respect to those First Day Pleadings requesting the authority to pay specific prepetition claims or continue selected prepetition programs—those First Day Pleadings seeking relief related to the Debtors' obligations to their employees, insurers, utilities, working interest holders, and taxing authorities—the relief requested is essential to the maintenance of the Debtors' operations and necessary to avoid immediate and irreparable harm to the Debtors' estates and creditors.

168. The success of the Chapter 11 Cases depends upon the Debtors' ability to continue their operations without disruption while they negotiate a resolution with key creditor constituencies. The relief requested in the First Day Pleadings is a critical component of maintaining business as usual in order to negotiate a path forward for the Chapter 11 Cases.

## D. Conclusion

169. For all of the reasons set forth herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

[*Remainder of page intentionally left blank*]

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this 4th day of June 2026.

/s/ Brooke McGuire
Brooke McGuire

# EXHIBIT 1

# BHPO ORGANIZATION STRUCTURE



*updated 6.3.2026*